**Electronically Filed
Intermediate Court of Appeals
30070
21-MAR-2013
10:07 AM**

NO. 30070

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

COLLEEN P. COLLINS, Plaintiff-Appellant,
v.
JOHN A. WASSELL, Defendant-Appellee.

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-D NO. 07-1-0206)

SUMMARY DISPOSITION ORDER
(By: Nakamura, C.J., and Foley, J.,
with Reifurth, J., dissenting)

Plaintiff-Appellant Colleen P. Collins (Collins) appeals from the September 9, 2009, Divorce Decree entered in the Family Court of the Third Circuit (Family Court).[1] The crux of Collins's appeal is that the Family Court erred when it concluded that Collins and her ex-husband Defendant-Appellee John A. Wassell (Wassell) did not form a premarital economic partnership, within the meaning of Helbush v. Helbush, 108 Hawaiʻi 508, 122 P.3d 288 (App. 2005). Specifically, Collins argues that the Family Court erred by: (1) concluding that the parties did not participate in a premarital economic partnership between June 18, 2000, the date of their initial wedding ceremony (Ceremony), and January 19, 2005, the date on which they were legally married (DOM); (2) finding that, following the Ceremony, Collins and

_____

[1] The Honorable Anthony K. Bartholomew presided.

Wassell agreed "that each of them would maintain separate financial identities, so that Ms. Collins could continue to qualify for the financial aid she needed to send her daughters to their schools of choice"; (3) finding that "Ms. Collins believed that the financial responsibility for sending her daughters to college was hers alone"; (4) finding that Wassell owed Collins $4,239.59 for the mortgage payoff on the Hawai'i Paradise Park residence owned by Wassell (HPP Residence); and (5) valuing Wassell's assets as of the DOM instead of the date of cohabitation (DOC) and dividing the assets and equalizing the parties' obligations using the DOM valuations. We affirm.

I.

A.

After the parties' divorce trial, the Family Court entered its Findings of Fact, Conclusions of Law, and Decision of the Court, which made the following relevant findings of fact:

On June 18, 2000, Collins and Wassell "met at the park with their friends and their minister for the apparent purpose of getting married." The couple "exchanged their vows, and they and all those assembled believed they had participated in a valid marriage ceremony." After the Ceremony, Collins and Wassell "began to have second thoughts about the practical consequences of their union and asked the minister not to mail in the marriage license and certificate to the State Department of Health[.]" The minister gave Collins the documents "with an understanding that the newly married couple would mail them in themselves." The following day, "the couple went on a short honeymoon[.]"

The parties' second thoughts about the marriage arose from the fact that Collins had two daughters attending expensive private mainland colleges, with tuition in excess of $30,000 per year for one daughter and approximately $22,000 per year for the other. Because "financial aid [was] calculated on the basis that Ms. Collins was a single parent, Ms. Collins actually paid approximately $8,000 a year for both daughters, a considerable savings over the full tuition." "Ms. Collins was concerned that

if financial aid for her daughters was calculated on the basis of the joint income and assets arising from her marriage to Mr. Wassell, that it would become considerably more expensive to send her daughters to the schools they were then attending." "Ms. Collins believed that if she were to marry Mr. Wassell and disclose the financial information reflecting her change in financial status to the two colleges," the financial aid for her daughters would be reduced and "she would likely be unable to afford the resulting tuition, with the consequence that her daughters would not be able to attend those colleges." To avoid that consequence, Collins and Wassell agreed (1) not to mail their marriage license and certificate to the Department of Health; and (2) that "each of them would maintain separate financial identities, so that Ms. Collins could continue to qualify for the financial aid she needed to send her daughters to their schools of choice."

Collins "believed that the financial responsibility for sending her daughters to college was hers alone, and that Mr. Wassell did not share in that obligation[.]" Similarly, Wassell believed that he was not obligated "to assist Ms. Collins with the financial burden arising from her daughters' college education."

Collins and Wassell never mailed in their marriage license or certificate. About four months after the Ceremony, they received a letter from the Department of Health inquiring about the marriage license and certificate. Collins and Wassell responded by sending "a letter to the Department of Health signed by both of them stating that they had decided not to get married after all."

After the parties' "honeymoon," they began living together. Wassell owned the HPP Residence, while Collins owned a townhouse in Pacific Heights (Townhouse). Although the parties "went back and forth between the two residences" for a while, they eventually decided to live in the Townhouse. While they were living in the Townhouse, Wassell rented out the HPP

3

Residence for some of the time, but never shared the rent with Collins despite the fact that he did not pay Collins rent. Soon after the Ceremony, Wassell added Collins's name to one of his bank accounts (Joint Account). The parties "agreed that the [J]oint [A]ccount would be used for household expenses; both were to deposit funds in the account." The parties deposited the cash gifts they received at the Ceremony into the Joint Account. Collins made regular monthly deposits of $500.00 into the Joint Account while Wassell made "few, if any, deposits" into that account. Except for the Joint Account, between the DOC and the DOM, Collins and Wassell maintained separate bank and retirement accounts.

In 2001, Collins decided to sell the Townhouse. Before the sale, Wassell made some minor improvements. Collins sold the Townhouse and received a check in the amount of $23,020.74 at the close of escrow, which was deposited into the Joint Account. Collins subsequently withdrew $13,647.26 to purchase a vehicle which was titled in her name only. A portion of the proceeds from the sale of the Townhouse, totaling $4,239.59, was used to pay off the remaining balance on Wassell's mortgage on the HPP Residence. Following the sale of the Townhouse, the parties moved into the HPP Residence.

Collins's youngest daughter finished college in 2005. With no further need for Collins to apply for or receive financial aid toward her daughters' college educations, Collins and Wassell legally married on January 19, 2005. As of the DOM, Wassell owed Collins a $4,239.59 debt, the amount Collins used to pay off the remainder of Wassell's HPP Residence mortgage.

The Family Court entered further findings regarding the value of the parties' assets on the DOM.

B.

The Family Court concluded that between the Ceremony (which shortly preceded the DOC) and the DOM, "the parties did not participate in an 'economic partnership' within the meaning of Helbush v. Helbush, 108 Haw[ai'i] 508 (App. 2005), and the

4

division of their marital assets by the court must therefore be based upon the date of their legal marriage." The Family Court provided the following detailed explanation of its rationale for this conclusion:

> The court's determination that the parties' relationship between June 2000, and January 2005, did not amount to a <u>Helbush</u> economic partnership is based upon several significant factors. The <u>Helbush</u> court stated its holding on this issue as follows:
>
> > We conclude that a "premarital economic partnership" occurs when, prior to their subsequent marriage, a man and a woman cohabit and apply their financial resources as well as their individual energies and efforts to and for the benefit of each other's person, assets, and liabilities.
>
> <u>Helbush</u>, <u>supra</u>, 108 Haw[ai'i] at 515.
>
> The first conclusion to be drawn from this language is that cohabitation alone is clearly not sufficient to establish an economic partnership -- there must be a commingling of finances, assets, and energies sufficiently comprehensive to establish a "partnership." Second, there is no such thing, for these purposes, as a "partial partnership." Parties who are emotionally involved with one another and who are cohabiting must inevitably com[m]ingle their energies and finances to some extent -- the exigencies of normal life and collective activity could scarcely allow it to be otherwise. Therefore, some measure of such commingling is to be expected in every instance of cohabitation, and does not by its mere existence rise to the level necessary to establish a <u>Helbush</u> "economic partnership."
>
> The question is therefore whether the parties in this case committed their energies and their assets to one another's purposes to the extent necessary to warrant a conclusion that they were engaged in a relationship akin to that found in a business partnership. It is worth noting that the parties in <u>Helbush</u> spent the period of their premarital cohabitation engaged in a joint farming enterprise in which both of them commuted to and farmed 310 acres in Kau, a clear example of cohabitation joined to collective financial enterprise. By comparison, the parties in this case, although they quite explicitly commingled a portion of their funds for housekeeping purposes, simultaneously maintained distinct separate financial identities.
>
> The most obvious example of this is clearly the parties' conscious decision not to make their first "marriage" legal for the express purpose of maintaining separate financial identities. This was done in order to realize two separate motives. [On] the one hand, it was done so that Ms. Collins could take full advantage of the financial aid available to her with regard to her daughters' college educations. On the other hand, it was done so that Mr. Wassell could refrain from shouldering any share of that

5

not insignificant burden. Far from reflecting the parties' intention to "apply their financial resources . . . to and for the benefit of each other's persons, assets, and liabilities," Helbush, supra, at 515, it reflects the parties' express intention not to do so. As a consequence of that express intention, Ms. Collins saved thousands of dollars and was able to provide her daughters with an education at their colleges of choice, while Mr. Wassell was able to preserve any of his own assets from being expended for that purpose.

It seems to the court not insignificant that Ms. Collins, in a series of financial aid applications, represented that she was single, a status she had preserved with calculation by consciously deciding not to make her apparent marriage to Mr. Wassell legal. Also, it is clearly relevant in this regard that both parties signed a letter to the State Department of Health in which they represented that they had decided not to become married.

Further, at all times during the period of their pre-marital cohabitation, in addition to their single joint "housekeeping" account, each of the parties maintained separate individual checking and savings accounts which appear for each to have been the vehicle for the bulk of their financial activity. In addition, each maintained separate retirement accounts, and separate life insurance policies. Each owned vehicles which appear from the parties' financial disclosures to have been titled in their individual names.

[Collins] attempts to deflect the import of these realities by citing to Epp v. Epp, 80 Haw[ai'i] 79 (App. 1995), in which the court stated:

[T]he fact that Husband and Wife conducted their real property and financial affairs as if they were not married is not a valid basis for deviating from the Partnership Model *because they were married*. 80 Haw[ai'i] at 93 (emphasis added).

The point of the emphasized language is obvious: when parties are married, application of the Partnership Model is necessary and automatic, regardless of their individual financial conduct. But the parties in this case were not married during the period at issue and the nature of their economic conduct during the period of their pre-marital cohabitation is clearly relevant. It is incongruous indeed for [Collins] to argue that evidence that she did not act like an economic partner during that period may not be considered by the court as evidence that no economic partnership existed.

[Collins] relies heavily on the existence of the [J]oint [A]ccount which was used primarily for household expenses in her argument that the parties were engaged in an economic partnership. [Collins] testified pointedly that she was the primary, if not the exclusive, contributor to that account, a fact which the court is prepared to accept at face value. However, it is [Collins's] clear inference that the [J]oint [A]ccount was the primary means of payment

6

for the bulk of the living expenses of both parties, an inference the court . . . finds unreasonable.

The evidence was to the effect that this account was maintained by monthly deposits of $500.00, an amount which was obviously insufficient to pay the living expenses of two adults. These apparently included food for two, utilities, internet service, telephone, cable television, and the operating expenses for two automobiles, not to mention entertainment and incidental expenses. The court notes that income and expense statements signed by the parties (Ms. Collins dated 9/26/08) and Mr. Wassell (dated 10/24/07) reflect total living expenses for the parties (not including rent paid by Ms. Collins) of $1,960.00, an amount almost four times the monthly contributions to the [J]oint [A]ccount.

The [J]oint [A]ccount no doubt reflected a measure of financial cooperation by the parties, but it seems wholly inadequate to carry the weight of establishing an economic partnership between them. This conclusion is not undermined by [Collins's] evidence that she was substantially the sole contributor to the [J]oint [A]ccount. Rather than suggesting an economic partnership, evidence of the one sided nature of [Collins's] contributions makes clear that the [J]oint [A]ccount was a "joint" account in name alone.

(Brackets in quotation from Epp v. Epp in original.)

C.

The Family Court divided the parties' assets and concluded that under strict application of marital partnership principles, Collins would owe Wassell an equalization payment of $11,807.85. However, finding that Wassell had wasted assets, the Family Court ordered a deviation in favor of Collins of $17,238.05. Therefore, the Family Court ordered Wassell to pay Collins an equalization payment of $5,430.20, the difference between $17,238.05 and $11,807.85, in final settlement of the property division in the case.

The Divorce Decree was filed on September 9, 2009. Collins filed a timely appeal.

II.

"Generally, the family court possesses wide discretion in making its decisions and those decision[s] will not be set aside unless there is a manifest abuse of discretion." Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006). We review the Family Court's findings of fact under the clearly erroneous

standard and its conclusions of law *de novo*, under the right/wrong standard.  Jaylo v. Jaylo, 125 Hawai'i 369, 373, 262 P.3d 245, 249 (2011).  The Family Court's division of property in a divorce "is discretionary with the trial court and will not be disturbed on review unless abuse of discretion is clearly shown."  Baker v. Bielski, 124 Hawai'i 455, 458, 248 P.3d 221, 224 (App. 2011) (internal quotation marks and citation omitted).

### III.

We resolve Collins's arguments on appeal as follows:

### A.

We decline to overturn the Family Court's determination, in its division of the parties' property, that no Helbush premarital economic partnership was formed.  The Family Court properly recognized that Helbush set forth the legal standard it was required to apply in evaluating whether Collins and Wassell had formed a premarital economic partnership.  The Family Court provided a detailed explanation of its reasoning in determining that no premarital economic partnership had been formed under the particular circumstances of this case.  The factors it cited in support of its decision were relevant to evaluating the parties' intent and the degree to which they applied their financial resources and efforts "to and for the benefit of each other's person, assets, and liabilities."  See Helbush, 108 Hawai'i at 155, 122 P.3d at 295.  As the trier of fact, it was the prerogative of the Family Court to determine credibility and the weight of the evidence, see State v. Miller, 105 Hawai'i 394, 402, 98 P.3d 265, 273 (App. 2004), and the Family Court's decision was based on factual findings supported by substantial evidence.  We conclude that the Family Court did not err in determining that no Helbush premarital economic partnership had been formed.

### B.

Collins challenges the Family Court's finding that the parties had agreed that "each of them would maintain separate financial identities, so that Ms. Collins could continue to

qualify for the financial aid she needed to send her daughters to their schools of choice." This finding is not clearly erroneous. Collins testified that the parties decided not to legalize their marriage in 2000 because she was afraid that her daughters might receive less financial aid for college. Thus, Collins's stated rationale for not getting married was to keep her legal financial identity separate and distinct from Wassell's. We conclude that the Family Court's finding was supported by substantial evidence and was not clearly erroneous.

C.

Collins argues that the Family Court's finding that "Ms. Collins believed that the financial responsibility for sending her daughters to college was hers alone" was clearly erroneous because Collins testified that she shared this responsibility with her daughters. However, when viewed in context, it appears clear that the import of the Family Court's finding was that as between Collins and Wassell, the financial responsibility for sending Collins's daughters to college was Collins's alone. There was substantial evidence to support the finding that as between Collins and Wassell, it was Collins's responsibility alone to finance her daughters' educations. Indeed, Collins does not challenge the Family Court's finding that Wassell did not share in, and did not believe he had, the obligation to assist Collins in financing her daughters' educations.[2/]

D.

We conclude that the Family Court did not clearly err in finding that as of the DOM, Wassell owed Collins a debt of $4,239.59, which was incurred when Collins used her funds to pay off Wassell's mortgage. The evidence showed that Wassell offered

---

[2/] Moreover, it was the financial responsibility as between Collins and Wassell for Collins's daughters' college educations, and not as between Collins and her daughters, that was relevant to the Family Court's determination of premarital economic partnership.

9

to repay the debt. We conclude that there was substantial evidence to support the Family Court's finding.

E.

Collins argues that the Family Court erred in valuing Wassell's assets as of the DOM, instead of the DOC, and dividing the assets and equalizing the parties' obligations using the DOM valuations. This argument is premised on her claim that the Family Court erred in determining that no premarital economic partnership was formed. Since we have already upheld the Family Court's determination that no premarital economic partnership was formed, it follows that Collins's argument that the Family Court erred in using the DOM in valuing Wassell's assets and dividing assets and equalizing the parties' obligations must fail.

IV.

For the foregoing reasons, we affirm the Divorce Decree.

DATED: Honolulu, Hawai'i, March 21, 2013.

On the briefs:

Joy A. San Buenaventura
for Plaintiff-Appellant

Andrew S. Iwashita
for Defendant-Appellee

*Craig H. Nakamura*
Chief Judge

*Daniel R. Foley*
Associate Judge